# Catawissa Railroad Company, Appellant, *v.* Philadelphia & Reading Railroad Company.

*Railroads—Lease—Covenants—Parallel roads.*

Plaintiff leased to defendant its railroad as well as its traffic contract rights with connecting or feeder railroads, for a period of 999 years, the defendant to maintain the road in good order and condition, keep it in public use, operate it with all reasonable care and efficiency and use all proper and reasonable means to maintain and increase the business thereof. Defendant subsequently became practically the owner of another connecting railroad having the same general direction as the leased railroad with practically the same terminals.   *Held,* that, while defendant may not violate the stipulations of the contract in letter and spirit and operate its own road for its own benefit without incurring liability to the plaintiff, yet its covenant is not broken by shipping large amounts of freight over its own parallel road, when the carrying of such freights over the leased road would have been impracticable, on account of its heavy grades, curvatures and ancient method of construction.

Argued Jan. 16, 1895.   Appeal, No. 374, Jan. T., 1894, by plaintiff, from decree of C. P. No. 4, Phila. Co., March T., 1889, No. 469, on bill in equity.   Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity for an injunction to restrain the diversion of freight from plaintiff's railroad.

The case was referred to Henry Flanders, Esq., as examiner and master, who reported as follows :

" First.   By indenture made Oct. 10, 1872, the Catawissa Railroad Company leased and demised its road to the Philadelphia & Reading Railroad Company for the full term of 999 years

from and including the 1st day of November, A. D. 1872; a copy of the lease is attached to the complainant's bill and marked 'Exhibit A.'

"Second. At the date of the lease and prior thereto, the Philadelphia & Reading Railroad Company operated a line of railroad from East Mahanoy Junction, or from Tamanend, three miles to the westward, and which was the eastern terminus of the Catawissa Railroad, to Shamokin. This line was made up of several small roads, which by merger and lease had passed into the hands of the Philadelphia & Reading Railroad Company, and constituted a part of its system.

"Third. About ten years after the lease of the Catawissa Railroad to the Philadelphia & Reading Railroad Company, the latter road entered into an agreement with the New York Central & Hudson River Railroad Company, the Fall Brook Coal Company, the Jersey Shore Pine Creek and Buffalo Railroad Company, and others, by which and supplementary agreements it undertook to extend its line from Shamokin to West Milton, thus intersecting the Catawissa Railroad at the latter point. This agreement and supplements were dated respectively Feb. 4th, and April 1st, and July 15th of the same year.

"Fourth. By the sixth article of this agreement the Reading Company covenants and agrees with the other companies that all railway traffic, the route, direction or destination of which it can control, from Philadelphia and intermediate points, and from points south of Philadelphia and destined for points upon or beyond the said new line, shall be thrown upon said new line. On its part the New York Central covenants with the Reading and other companies that all railway traffic from points on its line or from its western and northern connections, the route, direction or destination of which it can control, and intended for points upon or beyond the new line, shall be thrown upon the said new line.

"Fifth. The Philadelphia & Reading Railroad Company constructed the line from Shamokin to West Milton by means of a new railroad company formed for that purpose and called the Shamokin, Sunbury & Lewisburg Railroad Company. All the stock of this company was owned by the Philadelphia & Reading Railroad Company, which moreover by the agreement aforesaid had covenanted that the new company should do, keep and

perform all the covenants entered into by the Reading Company, with respect to the location, construction, maintenance and operation of the line between Shamokin and West Milton.

" Sixth. Upon the completion of the Shamokin, Sunbury & Lewisburg Railroad in July, 1893, the Reading Company leased it and has since controlled and operated it.

" Seventh. The distance from West Milton to Williamsport over the line of the Catawissa Railroad is about twenty-eight miles; its whole line from Williamsport to Tamanend is about ninety-six miles in length. If the Shamokin, Sunbury & Lewisburg Railroad is used from the point of intersection at West Milton in the transportation of freight and passengers the Catawissa gets about twenty-eight miles of the haul; if not used and the transportation is thrown entirely upon the Catawissa, then it gets about ninety-six miles.

" Eighth. At Shamokin and its vicinity are extensive anthracite coal fields, and the chief motive for building the Shamokin, Sunbury & Lewisburg Railroad was to transport the coal from these fields to northern and western points. It is conceded by the plaintiff, and the master finds, that this coal could not be successfully sent eastward to Tamanend and thence over the Catawissa Railroad to these northern and western points. The defendant was and is justified in sending it by the Shamokin, Sunbury & Lewisburg Railroad. The Catawissa thus gets the advantage of its transportation over about twenty-eight miles of its tracks. It gets the same advantage by the freight which comes back in return.

" Ninth. At the time the Reading leased the Catawissa, the latter road had no connection or outlet north or west of Williamsport. Its traffic originated or terminated at that place. Whether there should be extensions depended thereafter on the lessee. The lessor, by the terms of the lease, had parted with the independent power to make them. If made by the lessee the cost and expense were to be borne by him, and the lessor was to derive no direct revenue from them. The Reading was entitled to the whole of the freight accruing from the use of such extension and was to account for no part thereof to the Catawissa.

" Tenth. By the agreement of Feb. 4, 1882, and its supplements, the Reading, as already stated, was to extend its line

from Shamokin to West Milton. This line was completed in July, 1883, but the Reading at that period was involved in financial difficulties and during the three following years was in the hands of receivers and, as the answer alleges, the said line was not 'properly' completed and operated until March, 1887. Nevertheless it had been used in the transportation of coal, and during the four preceding years nearly a million and a half tons had passed over the road, the Catawissa getting its proportion of the freight on that part of its line between West Milton and Williamsport.

" Eleventh. In the same year that the Shamokin, Sunbury & Lewisburg Railroad was completed, to wit, 1883, the Catawissa, under the provisions of its charter, was extended by the lessee and at his cost from Williamsport to Newberry Junction, a distance of three and five tenths miles. In the same year the Pine Creek Railroad was opened from Newberry Junction to Jersey Shore, and in the course of the two following years the other parties to the aforesaid agreement and its supplements had completed the extensions and made the connections they had stipulated to make, and thus through a system of connecting lines was formed a new line from Philadelphia to Buffalo. These connections greatly increased the business of the Catawissa road. Between the years 1883 and 1887 hard coal was carried from Shamokin to West Milton and thence over the Catawissa to Newberry Junction, and soft coal from Newberry Junction by the way of Williamsport over the Catawissa to its eastern terminus; and passengers and miscellaneous freights over the entire line of the Catawissa to and from Williamsport.

" Twelfth. The anthracite and bituminous coal traffic arose entirely from the connections established by reason of the agreement of Feb. 4, 1882, and its supplements, as well as the miscellaneous through traffic. Apart from these sources of business the traffic proper to the Catawissa road was declining rather than increasing. In 1883 it lost the transportation of oil by reason of the construction of the pipe line, thus causing a reduction in its revenue of nearly $150,000 per annum, and the lumber trade which had been a chief factor in its transportation was from its nature in process of diminution.

" Thirteenth. The road itself by reason of elevations, grades, curvatures, trestles and bridges, and by reason of the increased

weight of modern engines and cars was not by comparison as well fitted as the Shamokin, Sunbury & Lewisburg Road for railroad purposes, nor could it have been so fitted without a very large expenditure, which by the terms of the lease was to be borne by the Catawissa, and if so fitted the new traffic could not be carried over its line without practical inconvenience and additional cost.

" Fourteenth. On the 20th of March, 1887, the bulk of the traffic, both eastern and western, which, since the year 1883 had been carried over the Catawissa, was withdrawn, and thereafter carried by the way of West Milton and Shamokin. At or about the same time the number of freight and passenger trains on the Catawissa road, those going northward as well as those going southward, were reduced and new time-tables were issued.

" Fifteenth. Nevertheless the new business which was still carried over that part of the Catawissa line between Williamsport and West Milton was large and valuable. Between March, 1887, and March, 1890, this new business, consisting of anthracite and bituminous coal, merchandise and passengers, amounted to $1,971,720.02.

" Sixteenth. The rental which the Reading stipulated to pay the Catawissa semiannually, during the term of the lease, was thirty per cent of the gross receipts, but from and after the 1st day of May, 1886, and the 1st day of November, 1886, the semi-annual rental was not to be less than $113,000; that is to say, $226,000 per year, whether thirty per cent of the gross receipts reached that sum or not. In addition to the rental, the annual interest on the mortgage indebtedness of the Catawissa, amounting at the date of the lease to the sum of $65,722.50 was payable by the Reading, and a further sum of $8,000 per annum was likewise payable by the Reading, to the Catawissa, to maintain the corporate organization of the latter.

" Seventeenth. From the date of the lease of the Catawissa to the Reading in 1872 to the year ending Oct. 31, 1890, the stipulated thirty per cent of the gross receipts have never, in any year except one (the year 1886), amounted to the aggregate of the above sums, and from the date of the diversion of the traffic at West Milton in March, 1887, to the year ending Oct. 31, 1890, thirty per cent of the gross receipts, even though

credited with the whole merchandise traffic from and to points between Williamsport and West Milton as if carried by way of the Catawissa, although in point of fact carried by the way of Shamokin, would fall short of the minimum rental, $166,939.05.

"Upon the foregoing facts the complainant insists inter alia that the Shamokin, Sunbury & Lewisburg Railroad is a parallel and competing railroad with the Catawissa, and that its lease by the Reading was illegal and void.

"1. With this contention the master does not agree. The Catawissa had been leased by the Reading for the term of nine hundred and ninety-nine years; subject to the covenants of the lease the Reading had practically become the owner of the road; it had passed into its possession and was a part of its system. The Shamokin, Sunbury & Lewisburg was likewise a part of its system and owned by it. There is nothing in the lease of the Catawissa that restricts the right of the Reading to extend its own line; that such extension is made through and by means of an independent organization does not affect the question. The Shamokin, Sunbury & Lewisburg Road was built, owned and controlled by the Reading Road. The lease as between the parties was a mere formula. The building of such a road under such circumstances, the master is of opinion, in nowise conflicts with section 4 of article 17 of the constitution of Pennsylvania. The constitutional inhibition relates to a different condition of things altogether. It is intended to prevent one independent railroad corporation from leasing or purchasing or controlling the works or franchises of another independent corporation having under its control or owning a parallel or competing line. The evil aimed at was the acquisition by one railroad of a rival road, and thus suppressing competition. The building by one road of another railroad to facilitate traffic is a totally different thing.

"2. Under any circumstances a parallel road, if it is not at the same time a competing road, doubtless, does not fall within the prohibition of the constitution. And in deciding the question whether a road is a competing road an important factor in the decision must always be the distance on either side of it from which it can draw its traffic. In France, where this question has been studied more scientifically perhaps than elsewhere, in calculating the probable traffic of a new line all

sources of traffic lying more than from three to six miles on either side of it are excluded. If the terminal points are the same, then the amount of that traffic must be considered, and brought into the calculation.

" 3. But, as already stated, the master is of opinion that the question of a parallel or competing road does not arise in this case and, therefore, forbears to discuss it at length.

" 4. The Reading Railroad Company was bound by the terms of the lease ' To maintain in good order and condition, keep in public use and operate with all reasonable care and efficiency the railroad hereby demised (the Catawissa), and shall and will use all proper and reasonable means to maintain and increase the business thereof.'

" 5. In stipulating to maintain and increase the business of the Catawissa, by all proper and reasonable means, the Reading did not thereby restrict or yield its right to promote its own business. By the extension of its own line and the connections which it made with other lines it brought into existence a very large amount of new traffic. In the transportation of this new traffic it uses a part of the Catawissa line. The contention is that it was bound to use the whole.

" 6. The master does not concur in this view of the question. By making use of the Catawissa as a link in the new line, established by the agreement of Feb. 4, 1882, and its supplements, the Reading threw upon that portion of the Catawissa, thus used, as already stated, a very large amount of new traffic. It .could do no more without impairing its own interests. In other words, the Reading while greatly promoting the business of the Catawissa, by using a part of its line in the transportation of the new traffic created by the Reading, was under no moral or legal obligation to diminish or impair its own business, by using the whole line, even though there were no impediments to its use. That it did temporarily use the whole is of no consequence. The Catawissa was benefited by such temporary use. But such temporary use, while the Reading was finally completing or perfecting its own line, established no right to a permanent use.

" 7. The preponderance of testimony clearly is, that the Reading could not carry the new traffic over the Catawissa without practically rebuilding the line and double tracking it. But

this, in the master's view of the case, is an unimportant inquiry, because he is of opinion that the Reading was bound by no legal duty or obligation to transfer the new traffic to that line, whether rebuilt or not.

"8. It is further contended that at the time the lease was made the Catawissa was contemplating the opening of a western connection, and is entitled to the new business arising from the connections made, or to be made, with other roads.

"9. Whether the Catawissa before the lease could have made connections (assuming that it contemplated making them) giving it an outlet to northern and western points is conjectural. The chief consideration that enabled the Reading to form these connections was her fields of anthracite coal, and she built the Shamokin, Sunbury & Lewisburg Railroad in order to send it forward, and the other roads to the north and west, extended their lines in order to receive and forward it, as well as to find a new market for their soft coal. But whether the Catawissa could or could not have formed similar connections, had it retained the power to form them, it nevertheless received its equitable proportion of the new traffic created by the connections made by the Reading, by having that part of its road between Williamsport and West Milton used as a link in the new line. There is nothing in the lease, nor in the nature of things, which raises any obligation on the part of the Reading, when, as under the circumstances of this case, it can use with advantage a part of the Catawissa, and with profit to both roads, to use the whole, though with inconvenience and loss to its own.

"10. As already observed, when the Catawissa leased its line to the Reading it parted with the independent power to make extensions or form connections with other roads. Thenceforward its rights were to be determined by the covenants of the lease.

"11. It is further urged on behalf of the Catawissa, that the western traffic was business which naturally belonged to the Catawissa, and was the natural result of the growth of the road.

"12. This is not obvious, and it would seem that the natural growth of a railroad's traffic is that which comes from the development of the country along its lines, the founding of industries, the opening of mines, if mines there are, and the increase of trade and population. Be this as it may, the master

is of opinion that the clause in the lease requiring, on the part of the lessee, the use of all proper and reasonable means to maintain and increase the business of the road, does not require, as a part of these means, the building of new lines. He may do so as a matter of business judgment and discretion, but the lease imposes on him no express or implied obligation to do it.

"13. It is hardly necessary to observe, in conclusion, that any diversion of the traffic proper to the Catawissa, any traffic originating or terminating in Williamsport or local traffic should be restored or accounted for as part of the receipts of the road. If under the prayer for general relief the complainant desires such an accounting it should be so ordered, although the master does not understand that it complains that it has not been credited with such receipts. Otherwise, the bill should be dismissed."

Upon exceptions to the master's report, THAYER, P. J., filed the following opinion :

" The grounds of complaint against the defendant set up in plaintiff's bill appear to be twofold : 1. It complains, that the building and leasing of the Shamokin, Sunbury & Lewisburg Railroad from Shamokin to West Milton were unlawful acts, being, as it alleges, in contravention of the prohibition contained in article XVII. section 4, of the constitution, forbidding the acquisition of the rights of a parallel and competing road by another company ; and 2, that the defendant, the Philadelphia & Reading Railroad Company, has used for many years past, and still continues to use, the Shamokin, Sunbury & Lewisburg Railroad for the transportation of freight, which the plaintiff says the defendant is bound in good faith and equity to carry over the Catawissa Road in consequence of certain covenants entered into by the defendant with the plaintiff, and contained in the lease of the Catawissa Railroad made between the plaintiff and defendant Oct. 10, 1872.

The first point made by the plaintiff, viz, that the building by the Reading of the Shamokin, Sunbury & Lewisburg Road was in effect the purchase of a parallel and competing line, and that so its possession and use of it is unlawful, was hardly touched upon by either side in the oral argument, and seems to be virtually abandoned in the printed argument. Nevertheless, as it has been made a prominent feature of the bill, we

have examined it, and have arrived at the conclusion reported by the learned master. A brief statement of the facts will show that the point is altogether untenable. By the lease of Oct. 10, 1872, which was for 999 years, the Philadelphia & Reading Railroad Company became the proprietor and virtual owner of the Catawissa Railroad upon the terms and subject to the covenants contained in the lease. At the date of the lease, and previously thereto, the Philadelphia & Reading Company operated several small connecting roads, extending from the eastern terminus of the Catawissa Railroad at Tamanend to Shamokin.

"About ten years after the lease of the Catawissa to the Philadelphia & Reading, the Philadelphia & Reading Company entered into contracts with the New York Central & Hudson River Railroad Company, and several other smaller companies, to build a connecting link from Shamokin to West Milton, intersecting the Catawissa Road at that point. The chief object of this was to open an outlet from the Schuylkill coal region northward and westward, by the way of Williamsport, for the transportation of anthracite coal to the markets of those regions, and for the mutual benefit of all the roads interested, including the Catawissa, for that road, belonging to the lessee, the Philadelphia & Reading, constituted between West Milton and Newberry Junction a necessary part of the new system of outlet. All the roads interested would, of course, benefit more or less by the building of the new link, for all would share to a greater or less extent in the profits of the newly opened transportation, and they would share also in the benefit resulting from the return freight over the portions of the several lines used, whether it consisted of the soft coal brought from the west or the general merchandise coming from the same direction. In order that the system of connections should be completed, the Philadelphia & Reading, after the lease, extended, at its own cost, the Catawissa Road from Williamsport to Newberry Junction.

" That the Philadelphia & Reading Company had authority to build the Shamokin, Sunbury & Lewisburg branch, in the manner in which it was accomplished, has not been questioned, and does not admit of doubt. Was it in any sense a competing road, the acquisition of which is prohibited by article XVII. of

the constitution? The object of the prohibition was clearly, as the master has pointed out, to prevent one independent railroad corporation from acquiring possession of the road of another independent company which is operating a competing line. It was to prevent the buying up by one railroad corporation of a competing line and the establishment thereby of a monopoly. The building by a company of an additional road for the purpose of facilitating and enlarging its own business can, by no fair process of reasoning, be contended to be within the constitutional prohibition, unless, indeed, a man can be said to compete with himself when he enlarges his own business or enters into a new one. Where there is competition there must be competitors, and with what propriety can the Philadelphia & Reading Company, running and operating the Shamokin, Sunbury & Lewisburg, be said to compete with itself in operating another railroad, which is its property, or is to be under its exclusive control for nine hundred and ninety-nine years? Competition in business is out of the question where all the business is in the hands of the same individual. It is also quite clear from all the evidence that the Shamokin, Sunbury & Lewisburg Road was not built as a competing road with the Catawissa, nor for any such purpose. Its sole object was to open up new northern and western connections for the Philadelphia & Reading, by an alliance with other interests and powerful roads which had no connections with the Catawissa, and between which and the Catawissa there had never been any competition nor rivalry whatsoever, and could not be under existing conditions at the time when the new road was built

"If the Philadelphia & Reading was not the owner of the Catawissa, then it was engaged, according to the plaintiff's argument, in building a competing line, which is a policy encouraged by the constitution and not prohibited by it. If it was the owner, then it was simply building an additional line for itself. There is no question in the case, therefore, of buying up a competing line. There was not a word in the lease by which the Philadelphia & Reading acquired the Catawissa which prevented the building of new roads by it and forming any new connections which it might desire or consider profitable for the enlargement of its own business. It is apparent, therefore, that it was neither prohibited by the constitution

nor precluded by its agreement with the Catawissa from continuing its road from Shamokin to West Milton. And if it had the right to build the road it had the right to use it, and to all the profit to be derived from its use and operation, and with this I dismiss the point.

"Upon the second point, viz, that the defendant has made an unfair use of the Shamokin, Sunbury & Lewisburg Road, by diverting traffic from the Catawissa Road, and sending it over the Shamokin, Sunbury & Lewisburg, for the purpose of benefiting itself, and at the expense of the rental to be paid by the defendant to the plaintiff, we are of the opinion, after the examination of the evidence, that no case has been made out by the plaintiff which entitles it to equitable relief. It is important, in the first place, to understand properly the scope of the covenant which the plaintiff alleges the defendant has broken, and the extent of the obligations which that covenant imposed upon the defendant. What the plaintiff chiefly relies upon is the covenant contained in the eighth article of the lease, by which it was agreed by the defendant that it would maintain the Catawissa in good order and condition, operate it with reasonable care and efficiency, and use all proper and reasonable means to maintain and increase the business thereof. The plaintiff contends that the defendant has broken the last clause of the covenant, in not transporting all freight which comes to West Milton, whether coming either from the north or the south, over the Catawissa instead of the Shamokin, Sunbury & Lewisburg Railroad. I do not, I think, overstate the extent of the plaintiff's demand in this respect. Not only was it so argued, but it will be observed that by its bill it asks us to enjoin the defendant from carrying over the Shamokin, Sunbury & Lewisburg Road all freight ' originating at West Milton, or at points east, north, or northwest thereof, as well as all freight originating at East Mahanoy Junction, or at points south, southeast, north or northwest thereof.' The plaintiff's bill is therefore virtually and in terms a bill to enjoin the defendant from operating the Shamokin, Sunbury & Lewisburg Railroad, as well as the road from Shamokin to East Mahanoy Junction, which was a necessary link in the connection, and which was acquired from several other independent companies by the defendant long before it entered into the agreement

with the plaintiff for the lease of the Catawissa. The plaintiff in its bill also asks that the defendant may be compelled to account with it for all freight carried over the Shamokin, Sunbury & Lewisburg Road. It does not complain that the defendant has appropriated more than its share of the receipts for freight carried over the Shamokin, Sunbury & Lewisburg Road, but that it has appropriated any part of it. This is, of course, to deny the right of the defendant to build the road at all—a denial which is wholly without evidence to sustain it, unless we are to assume that the words of the covenant, which I have quoted, are sufficiently potential to produce the results contended for. With such a conclusion we can by no means agree. The defendant did not, by entering into the lease with the plaintiff, debar it of any right which it already possessed. It surrendered none of its franchises or corporate powers, nor did it agree to subordinate its own business to the interests of the lessor, nor to abstain from extending its system and making such connections with other roads as might conduce to its profit and advantage. It is not to be presumed that it would have been willing to acquire the plaintiff's road upon any such terms.

" A covenant to use all proper means to increase another man's business does not necessarily imply that he shall neglect his own, or that he shall derive no profit for himself from anything which might possibly be turned to the advantage of the other.

" The defendant is required to use all reasonable means to maintain and increase the business of the road. This means that it will do what is usually accounted reasonable, and what ought to be so accounted by reasonable men. It is difficult, perhaps impossible, to bring within the limits of a precise definition exactly what is required by an undertaking in such general terms. It can only be determined when questions arise in regard to the particular actions and conduct of the party and their results. The defendant in the present case, by the extension of its own line and its connections, according to the report of the master, greatly benefited the Catawissa, bringing into existence, according to the report of the master, a very large amount of new traffic, in the prosecution of which it used a large portion of the Catawissa road. The plaintiff

contended that it was bound to use the whole, and to send the whole traffic over the Catawissa. It could not have done that without greatly injuring its own interests; if it had done so its own road would have been idle. We agree with the master that the Philadelphia & Reading, while greatly promoting the business of the Catawissa, by using a part of its line in the transportation of the new traffic created by the new northern and western connections, was under no legal obligation to restrict or impair its own business by using the whole Catawissa line to the exclusion of the road which it had itself built at a cost of $4,000,000, for the purpose of establishing the connections which produced the new business. The master, moreover, has reported that the preponderance of the testimony is that, owing to its condition and the peculiarities of the construction of the Catawissa, the new traffic created by the Reading could not have continued to be carried over the Catawissa without first practically rebuilding the road, an expense which is not incumbent on the defendant to incur.

" If any traffic has been diverted from the Catawissa which properly, peculiarly, or naturally belongs to it, that is, traffic originating or terminating at Williamsport, or arising from the development of .the industries of the country bordering upon its line, and if it could be shown to amount in value to a sum which would affect the rental paid to the plaintiff according to the terms. of the lease, the plaintiff might justly complain of such an injury and ask redress for it. But that is not the case presented by the bill, nor is it the case for which the plaintiff is contending. What it demands is that, in settling the amount of rent to be paid by the defendant, it should account for the gross receipts of the Shamokin, Sunbury & Lewisburg Road since March, 1887, and pay the plaintiff thirty per centum of such gross receipts. We agree with the learned master that the facts of the case do not sustain such a demand, and that the plaintiff has shown no such equity as would justify us in making such a decree as it asks for. The plaintiff was protected by a fixed minimum rental stipulated for in the lease. It has not shown any state of facts which entitles it to add to that amount thirty per cent of the gross receipts of the Shamokin, Sunbury & Lewisburg Road.

" To sum up the whole controversy, we are of opinion that

the defendant had a right to build the Shamokin, Sunbury & Lewisburg Road; that neither the constitutional provision, which has been appealed to, nor the agreement which it entered into with the Catawissa for the lease of its road, presented any just or lawful obstacle to its doing so, and that having built it, it has the right to operate it for its own benefit, without incurring any responsibility to the plaintiff for the manner in which it has operated it, or any liability to account with the plaintiff for the freights sent over its road.

" The exceptions are dismissed.

" The report of the master is confirmed, and the bill is dismissed with costs to be paid by the plaintiff.

### DECREE.

" And now, Jan. 27, 1894, this cause having come on to be heard upon exceptions to the report of the master, and having been argued by counsel, and the court being duly advised in the premises, it is ordered, adjudged, and decreed that the exceptions to the report of the master be and they are hereby dismissed, and the said report be and the same is hereby confirmed, and the bill of the plaintiff is dismissed with costs to be paid by the plaintiff."

*Error assigned*, among others, was above decree.

*George Tucker Bispham, A. H. Wintersteen* with him, for appellant.—Under the covenants of the lease, including the covenant to use all proper and reasonable means to maintain and increase the business of the plaintiff's road, the defendant was bound affirmatively to increase the plaintiff's business to the fullest extent reasonably possible, and negatively to procure for itself no advantage of any nature inconsistent with or interfering with such increase, and the conduct of the defendant has been in breach of these covenants.

No evidence of special facts was produced sufficient to justify the defendant in diverting through traffic from the plaintiff in the manner complained of.

*Thomas Hart, Jr.*, and *Samuel Dickson*, for appellee.—The Catawissa Railroad, as now constructed, is not in condition to

do properly, with safety and promptitude, the new business which was acquired by the making of the new railroad connections beyond Williamsport under the contracts of 1882.

To do the south-bound business as the plaintiff contended it should be done over the whole line of the Catawissa Railroad, would involve a method of operation in connection with the transportation of hard coal over the Shamokin Railroad, northward, so expensive and difficult in conducting, that it cannot be said to be a proper and reasonable means to increase the traffic of the Catawissa Railroad under the terms of the eighth covenant of the lease.

A master's report upon the facts is all but conclusive, and the consideration of the testimony in this case shows that it cannot be contended there has been any such glaring error in the master's findings as will induce this court to set them aside: Burton's App., 93 Pa. 214; Bugbee's App., 110 Pa. 331.

OPINION BY MR. JUSTICE DEAN, May 30, 1895:

A thorough examination of the voluminous testimony in this case, has convinced us that the conclusions of the master and the decree of the court below are right. The plaintiff, on 10th October, 1872, leased to defendant its railroad, for a period of nine hundred and ninety-nine years, as well as all its traffic contract rights with connecting or feeder railroads, and with shippers; the leased road to be run, used and operated by the defendant, upon certain terms and conditions. As a consideration, the defendant agreed to pay the maturing interest on certain obligations of the plaintiff company, and eventually the principal, and, in addition, semiannually as rental, a sum equal to thirty per cent of the gross receipts of the leased road. This was the minimum; even this was protected by the further stipulation, that the annual rental was never to fall below $226,000 per year. The lessee further agreed to maintain the road in good order and repair; operate it with all reasonable care and efficiency; and further, use all proper and reasonable means to maintain and increase the business thereof.

As the value or amount of the rental, beyond the minimum, payable to plaintiff, would depend on the amount of the gross receipts, the importance of this last clause becomes apparent. The defendant, about ten years after the lease of the Cata-

wissa Railroad, became practically the owner of the Shamokin Railroad, a connecting road, having the same general direction as the Catawissa, and practically east and west the same terminals; while operating this road, nominally, under a lease, defendant really was the owner. The burden of plaintiff's complaint is, that it being to defendant's interest to promote traffic on the last named road, it wrongfully, and to the prejudice of the Catawissa, diverted traffic from the Catawissa to the Shamokin.

The fact is undisputed, that, by reason of traffic contracts made by defendant with new western connections, the carrying business, thereafter, of anthracite coal west and bituminous east, greatly increased. If the whole of defendant's coal traffic west from Shamokin had been put on the Catawissa, it would have had a haul of ninety-six miles, the entire length of its road, but as much of it was diverted to the Shamokin at the point of intersection with the Catawissa, the latter got but twenty-eight miles; and the respective hauls were the same with the return freights east.

The master found, that to have given the Catawissa the carrying of all this freight, would, on account of its grades, curvatures and ancient methods of construction, have been impracticable; but, nevertheless, that defendant, by its traffic contracts with connecting roads east and west, had largely increased the traffic of the Catawissa. Notwithstanding this increase, however, with the exception of one year, 1886, thirty per cent of the aggregate gross receipts has never equalled the minimum rental.

While we concur, almost throughout, in the findings of fact and conclusions of the master and the court below, that plaintiff, under the evidence, has presented no case which entitles it to an account up to the date of the filing of the bill in this case, we will not undertake now to give a construction to this lease which would determine the rights of the parties, in the future, under a different state of facts. The defendant covenanted that it would, during the term, "maintain in good order and condition, keep in public use, and operate with all reasonable care and efficiency, the Catawissa Railroad, and shall and will use all proper and reasonable means to maintain and increase the business thereof." As is properly said by the court

below, "It is difficult, perhaps impossible, to bring within the limits of a precise definition exactly what is required by an undertaking in such general terms." But we decline to say that the defendant had a right, in view of this covenant, to operate its own road for its own benefit, without incurring any responsibility to the plaintiff. We can easily see how defendant, by the operation of its own road, might violate this stipulation, in both spirit and letter, and thereby become answerable to plaintiff. While it is clear from the evidence, that, up to this time, it has not done so; and while no precise definition of its duty, under this general covenant, ought now to be given; still, future operations can alone determine its future responsibility. In giving the lease a construction applicable only to the facts before us, we avoid any prejudice of plaintiff's right, or suggestion of wrong on part of defendant.

The decree is affirmed, and the appeal is dismissed.